# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIA ELLEN BUNNEY,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>RON KENAN,<br><br>　　　　　Respondent.<br>_____/ | 1:06-CV-00415 OWW NEW (DLB) HC<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented in this action by Michael Satris, Esq.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Marin, following her conviction by court trial on April 5, 1982, of first degree murder in violation of Cal. Penal Code § 187. See Exhibit A, Respondent's Answer to Petition (hereinafter "Answer"). On May 25, 1982, Petitioner was sentenced to serve an indeterminate term of 25 years to life in state prison. Id.

On March 3, 2004, and July 28, 2005, parole suitability hearings were held before the California Board of Prison Terms (now the Board of Parole Hearings - "BPH"). See Answer,

Exhibits B and C. Petitioner attended both hearings and was represented by her attorney, Michael Satris. Id. At the conclusion of the 2004 hearing, the BPH denied parole and deferred rehearing for one year. Id. Following the 2005 hearing, the BPH denied parole and deferred rehearing for two years. Id.

On November 17, 2004, Petitioner filed a petition for writ of habeas corpus in the Marin County Superior Court challenging the BPH's decision. See Answer, Exhibit D. In a reasoned decision, on February 22, 2005, the petition was denied. Id.

Petitioner next filed petitions for writ of habeas corpus in the California Court of Appeals, Fifth Appellate District. See Answer, Exhibit E. On May 26, 2005, and February 16, 2006, the petitions were summarily denied. Id.

Petitioner proceeded to file petitions for writ of habeas corpus in the California Supreme Court. See Answer, Exhibit F. Those petitions were summarily denied on August 17, 2005, and May 10, 2006. Id.

On January 9, 2006, Petitioner filed the instant petition for writ of habeas corpus in the United States District Court for the Northern District of California. The matter was transferred to the Fresno Division on February 27, 2006. The petition for writ of habeas corpus challenges the 2004 and 2005 decisions of the BPH denying parole. Petitioner contends the decisions were arbitrary, capricious and fundamentally unfair in violation of her due process rights. She further contends the State's decision to deny her parole imposes cruel and unusual punishment upon her in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

On October 31, 2006, Respondent filed an answer to the petition. Petitioner filed a traverse to Respondent's answer on November 30, 2006.

On December 1, 2006, Petitioner filed a motion for an order directing Respondent to file all exhibits Petitioner had filed with her state habeas petitions.

The undersigned issued a Findings and Recommendation on April 12, 2007, which had recommended the petition be denied. In addition, Petitioner's motion for an order to file all exhibits was denied. Petitioner filed objections to the Findings and Recommendation on May 11, 2007.

1    On June 15, 2007, the undersigned vacated the Findings and Recommendation and Order
2 of April 12, 2007, in light of Petitioner's objections. It was further ordered that Respondent file
3 all of Petitioner's state court habeas petitions and exhibits. Respondent complied on August 1,
4 2007.

## DISCUSSION

I.    Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for her habeas petition because she meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination

1    of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C.
2    § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.
3         As a threshold matter, this Court must "first decide what constitutes 'clearly established
4    Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,
5    *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this
6    Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as
7    of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other
8    words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or
9    principles set forth by the Supreme Court at the time the state court renders its decision." Id.
10        Finally, this Court must consider whether the state court's decision was "contrary to, or
11   involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at
12   72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may
13   grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]
14   Court on a question of law or if the state court decides a case differently than [the] Court has on a
15   set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.
16   at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the
17   state court identifies the correct governing legal principle from [the] Court's decisions but
18   unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at
19   413.
20        "[A] federal court may not issue the writ simply because the court concludes in its
21   independent judgment that the relevant state court decision applied clearly established federal
22   law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.
23   A federal habeas court making the "unreasonable application" inquiry should ask whether the
24   state court's application of clearly established federal law was "objectively unreasonable." Id. at
25   409.
26        Petitioner has the burden of establishing that the decision of the state court is contrary to
27   or involved an unreasonable application of United States Supreme Court precedent. Baylor v.
28   Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

4

states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

II.     Review of Claims

A parole release determination is not subject to all the due process protections of an adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural protections that particular situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, the only process to which an inmate is entitled is: 1) the inmate must receive advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; 3) if the inmate is denied parole, the inmate must be told why "he falls short of qualifying for parole," Id.; and 4) the decision of the Board must be supported by "some evidence" having an indicia of reliability, Superintendent, Mass. Correc. Inst. v. Hill, 472 U.S. 445, 455 (1985); Cato v. Rushen, 824 F.2d 703, 705 (9th Cir.1987).

"In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record.' 472 U.S. 445, 454 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass, 461 F.3d at 1128. In determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. Id. Rather,

5

the Court must determine whether there is any evidence in the record that could support the conclusion of the disciplinary board. Id., *citing* Superintendent v. Hill, at 455-56. Although Hill involved the accumulation of good time credits, the same standard applies to parole, as both situations "directly affect the duration of the prison term." Id., *citing* Jancsek v. Oregon Bd. of Parole, 833 F.2d at 1390.

With regard to the procedural protections outlined in Greenholtz, as Respondent submits and Petitioner concedes, Petitioner was provided all that is required. Petitioner was provided with advance notice of the hearing, representation by counsel at the hearing, an opportunity to submit materials for the Board's consideration, an opportunity to be heard during the hearing, and a written decision explaining the reasons why parole was denied. See Exhibits B and C, Answer.

Petitioner, however, contends the BPH's decision was arbitrary, capricious and fundamentally unfair. After reviewing all relevant evidence, including the expanded record (state court petitions, sentencing transcript, probation report, Petitioner's personal statement, psychological evaluations, statistical information, and exhibits), the Court finds that the state court decisions rejecting Petitioner's claims were not unreasonable, because the BPH's decisions are supported by "some evidence."

In denying parole in 2004 and 2005, the BPH considered and found several factors indicating unsuitability. In both hearings, the BPH relied heavily, though not exclusively, on the facts of the commitment offense. Pursuant to 15 Cal.Code Regs. § 2402(c)(1)(D)[1], the Board found the first degree murder was carried out in an exceptionally cruel and callous manner. A

---

[1] Pursuant to Title 15, of the California Code of Regulations, Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for parole when the prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
 (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
 (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
 (C) The victim was abused, defiled or mutilated during or after the offense.
 (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
 (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

15 Cal.Code Regs. § 2402(c)(1)(A)-(E).

1  review of the entire record shows this finding is supported by at least "some evidence."

2  Petitioner entered into a romantic relationship with the victim, Tom Dubois, in December of 1979. See Lodged Doc. Part 1, Attachment 4 at 24[2]. At some point thereafter, the victim moved to Canada to further his studies. Id. Petitioner and the victim carried on a long-distance relationship until the summer of 1981 with periods of time in between when the victim would visit. Id. In the summer of 1981, the victim came home for summer break. Id. At that time, the victim informed Petitioner that the relationship was over. Id. Thereafter, Petitioner purchased an unassembled shotgun, and learned how to assemble, load and use it. See Lodged Doc. Part 1, Attachment 3 at 6; Lodged Doc. Part 3, Attachment 4 at 20-24. She chose to purchase a shotgun instead of a handgun so she would not have to wait. See Lodged Doc. Part 1, Attachment 3 at 87; Lodged Doc. Part 1, Attachment 8 at 96. When asked by the store clerk why she was interested in purchasing a shotgun, she stated she needed it because she was having problems with her boyfriend and she needed it for protection.[3] See Lodged Doc. Part 3, Attachment 4 at 18. The next day, the victim visited Petitioner's home to pick up his fishing gear. See Lodged Doc. Part 1, Attachment 3 at 6; Lodged Doc. Part 1, Attachment 3 at 6. Petitioner then engaged him in a conversation about their relationship. See Lodged Doc. Part 1, Attachment 3 at 87-88. At some point while the victim was at Petitioner's house, the victim turned away from Petitioner and Petitioner delivered a shotgun blast to his back. Id. at 88; Lodged Doc. Part 1, Attachment 3 at 8. It is not known when the victim died, but it is clear he succumbed to his wounds at some point after he was shot until his body was discovered the following day by the police officer.[4] What is

---

[2]"Lodged Doc." refers to the documents lodged by Respondent on August 1, 2007, pursuant to Petitioner's request and the Court's June 15, 2007, Order.

[3]This evidence stands in stark contrast to Petitioner's later self-serving claims of purchasing the shotgun because she intended to commit suicide. It is clear her intended victim was not herself but her boyfriend. This is further borne out by the fact she was convicted of premeditated first degree murder, not second degree murder.

[4]Petitioner claims the single shot fired by her was immediately fatal. See Petitioner's Objections at 3. She cites to Pirtle v. California Bd. of Prison Terms, et al., No. CIV S-04-0518 FCD KJM P, 2007 WL 1140817 *13 (E.D. Cal.2007) as an analogous situation. However, Pirtle is readily distinguishable from the instant case. There is no evidence that the victim in this case died immediately. He sustained a shotgun blast to his back. A shotgun discharges numerous small pellets at once, not a single large bullet. Unlike Pirtle, where the victim sustained a single shot to his heart, it is entirely possible the victim in this case survived for some time after sustaining the injury.

clear, however, is that Petitioner remained in the house with the dead or dying victim, and rather than summon aid, she calmly and coolly denied knowing his whereabouts to the victim's father when he called attempting to locate him. See Lodged Doc. Part 1, Attachment 3 at 5. Further, she occupied her time until the next day when the police arrived in response to the victim's mother's telephone call by writing approximately twenty letters to friends and family. Id. at 88; Lodged Doc. Part 1, Attachment 3 at 8. Petitioner's claims of acting in an emotionally overwhelmed state do not bear up well against the evidence that Petitioner was very controlled and calm when she spoke to the victim's father and also managed to write approximately twenty letters. Furthermore, inasmuch as Petitioner would depict it otherwise, she was in fact found guilty of premeditated first degree murder.

When the police arrived, Petitioner's family informed the police that the victim was in the house and Petitioner had shot and killed him. See Lodged Doc. Part 1, Attachment 3 at 7. Eventually, the police were able to seize Petitioner and take her into custody. Petitioner admitted to the arresting officer that "she killed Ted because if she couldn't have him nobody else could either." Id. In light of these facts, there is "some evidence" supporting the BPH's finding that the murder was carried out in a manner which demonstrates exceptionally callous disregard for human life and suffering. 15 Cal. Code Regs. § 2402(c)(1)(D); Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir.2003).

Petitioner argues in mitigation that her actions were the result of an enormous amount of stress. In essence, she attempts to make herself out to be the victim and convert her offense to one of diminished capacity murder. She likens her situation to the defendant in Pirtle who shot and killed his estranged wife. 2007 WL 1140817 *13. Again, the two cases are not the same. The defendant in Pirtle was convicted of second degree murder; here, Petitioner was convicted of premeditated first degree murder. Id. In Pirtle, the defendant found his wife dancing and drinking with another man at a bar. Id. When the defendant approached his wife, she informed him that she was going to go home with her dancing partner at which point the defendant shot and killed her. Id. Here, Petitioner was no longer in a relationship with the victim. The victim had ended the relationship weeks before. Further, they were not married; they had been in a long-distance

relationship in which they had been separated for substantial periods of time. Also, Petitioner did not catch the victim in the act. He had informed her well before that he was no longer in a relationship with her and that he was dating other people. Petitioner did not act in the heat of the moment; she purchased a weapon in advance, learned how to assemble, use and load it, and then fired it at the victim when he had turned his back.

Petitioner represents that she acted out of fear of the victim, but there is absolutely no support for this, and the claim is directly controverted by the fact the victim was shot in the back. See Lodged Doc. Part 1, Attachment 3 at 63. Petitioner further claims she was a victim of Battered Women's Syndrome ("BWS") and she has sought treatment and assistance in a BWS program. Yet this is only another demonstration of the manner in which Petitioner has attempted to place blame on others and not herself, and further reason why the Board has stated Petitioner needs further self-help treatment. Her BWS claim was never found to be true at trial. In addition, an investigation determined that Petitioner's claim of BWS at the time of the offense was unsubstantiated. Id at 57.

Petitioner points to the assessments by her retained psychiatrists, Dr. Linda S. Barnard and Dr. Daniel J. Sonkin, as evidence of her mental status at the time of the offense. See Lodged Doc. Part 2, Attachment 6; Part 3, Attachment 1. Nevertheless, the Board considered this evidence in its determination. See Lodged Doc. Part 1, Attachment 3 at 56. It is sufficient that there is "some evidence" supporting the Board's determination, not whether the evidence presented by Petitioner outweighs the evidence relied on by the Board.

With respect to the commitment offense, the BPH also found the motive for the killing was "most trivial." See Lodged Doc. Part 1, Attachment 3 at 87. As stated above, Petitioner and the victim had dated for approximately 18 months when the victim ended the relationship. Id. at 5. The relationship was long-distance and was characterized by long periods of separation. Prior to ending the relationship, the victim had informed Petitioner that he had begun dating other people. Upon his return home, he informed Petitioner their relationship was over. He then began dating other people with Petitioner's full knowledge. One month later, when the victim came to Petitioner's house at her request so he could pick up some of his things, she reacted by shooting

1 him in the back. Certainly, the Board's finding that the motive was trivial is supported by some
2 evidence. 15 Cal. Code Regs. § 2402(c)(1)(E).
3       The BPH also noted Petitioner had a history of unstable and tumultuous relationships.
4 This also is an enumerated circumstance demonstrating unsuitability. 15 Cal. Code Regs.
5 § 2402(c)(3). In make this finding, the Board noted that Petitioner had a history of
6 "unsatisfactory romantic relationships, involving two broken marriages and involving,
7 apparently, another extended live-in relationship that was not successful, a self-described period
8 of sexual promiscuity, which was indicative of an inability to form more lasting relationships, all
9 of which is described by [Petitioner]." See Lodged Doc. Part 1, Attachment 3 at 88. When
10 Petitioner had experienced failure in her prior relationships, she would become extremely
11 emotionally troubled to the point of considering violence, namely suicide. When this evidence is
12 considered along with Dr. Walker's assessment, discussed *infra*, and Petitioner's conduct in the
13 institution, discussed *infra*, the predictive value of Petitioner's past social history remains
14 relevant. C.f. Tolliver v. Carey, No. CIV-S-05-2125 GEB HHG P, 2006 WL 3497670 (E.D. Cal.
15 2006). Accordingly, the Board's conclusions under § 2402(c)(3) are supported by at least some
16 evidence.
17       Pursuant to 15 Cal. Code Regs. § 2402(c)(5), the Board also considered psychological
18 factors in finding Petitioner unsuitable for parole. The Board found significant the psychiatric
19 report of March 8, 2002, authored by Dr. Walker, which was quoted by the Board as follows:

> The index offense presents as a crime of affect-laden violence and was committed after the breakup of an intimate relationship with the victim. The inmate reportedly had a history of emotional and dramatic behavior along with extreme sensitivity and a desire to please important others, (in exchange for others being appropriately responsive to her needs) since her adolescence. The inmate, at least since 1996, has supported her behavior, (without personally condoning it), via reliance of her reported history of being a victim of physical, emotional, and sexual abuse. There is no prior indication in the probation officer's report suggesting physical or sexual abuse of the inmate. *Pre-sentencing psychiatric evaluations have uniformally [sic] opined that the inmate has prominent features of a borderline personality disorder. There is a strong indication that the inmate could readily, when she felt emotionally wounded, disconnect herself from the outside influence and focus only on her own feelings of hurt and related rage.* She has evidenced a pattern of compartmentalizing her emotional focus and obfuscating much of her affect of reality via her tendency to intellectualize. As a result she appears incongruent in the relationship in her words and her affect. Her life was an impressionistic view of the world, never seeing it clearly or feeling a part of it, but only having a vague sense of what it was suppose to be like. Of some concern is that the inmate's version of the offense,

> particularly in regard to detail, behaviors, thoughts and feelings, has changed little, if at all, since she gave a statement to the police in 1981. Her self-description as essentially a helpless, thoughtless, numbed, emotionally wrecked shell of a person is inconsistent with her apparently plan-full behaviors in days leading up to the murder and in her controlled demeanor and organized skills afterwards. Additionally, as she was allegedly in individual therapy at the time leading up to the murder, there was certainly a viable avenue for support and discussion towards positive conflict resolution. Moreover, after years of therapy and interpersonal efforts at introspection, one might expect fewer "I don't knows" and "I don't remembers," than Ms. Bunney offered in the current evaluation. Her stance of being a, "battered woman," as a primary contributing factor does not co-opt her ability or her mandate to explore some of her manipulative personality dynamics that were blatantly evident at the time of the crime. She appears reluctant to take a full measure of responsibility for the murder (e.g., in other words, he was shot in the back), despite her verbalization to the contrary. Surprisingly, she also continues to speak of the victim as being cruel and sadistic, which at this stage of her incarceration and at her age suggests on-going but sublimated personality factors that still effect her perception.

See Lodged Doc. Part 1, Attachment 3 at 89-93 (emphasis added).

The BPH found this report to be "disturbing evidence." The Board concluded that these psychological and emotional issues demonstrate that Petitioner continues to be an unreasonable risk to society. Id. at 96. Petitioner argues that the above reservations expressed by the reviewing psychiatrist were outdated when considered by the BPH since the report was prepared in 2002 and Dr. Walker had since authored two more recent reports in 2003. Nevertheless, the BPH considered all of Dr. Walker's reports in its decision. Moreover, Dr. Walker's November 2003 follow-up assessment expressly referred the BPH to his 2002 evaluation for his diagnostic assessment. He stated: "The BPT is respectfully referred to the two most recent psychological evaluations authored for the inmate's BPT hearings by the undersigned evaluator for risk assessment estimates and conclusions." See Lodged Doc. Part 2, Attachment 3 at 15. He further stated "Diagnostic assessments and conclusion remain unchanged from the previous two reports submitted to the Board by the undersigned author." Id. at 15-16. Although Dr. Walker continued to conclude Petitioner had a low risk of re-offending, the psychological evaluation quoted above has never been softened or repudiated. Thus, the psychiatrist's findings were correctly relied on by the Board and are indeed "some evidence" supporting the Board's finding of unsuitability.

In addition to Dr. Walker's assessment, Petitioner also received evaluations from correctional counselors in 2003 which concluded that, due to her lack of insight in her actions and her history of psychological problems, Petitioner would pose an unpredictable degree of risk

if released. See Lodged Doc. Part 3, Attachment 2 at 6-7. It is true Petitioner has received assessments from two psychiatrists retained by her which conflict with the above-discussed assessments; nevertheless as previously stated, it is sufficient that there is some evidence supporting the Board's findings. Superintendent, 472 U.S. at 454.

The BPH also considered Petitioner's post-commitment behavior per § 2402(c)(6). The Board noted that Petitioner had not received a "chrono" for serious misconduct since 1992. However, the Board discussed a recent pattern of negative behavior in prison. The negative behavior included instances of disrespect towards staff and rude and disrespectful behavior to other inmates in the room which resulted in a room change. While these instance cannot be considered individually to be "serious misconduct" per § 2406(c)(6), they can be considered as demonstrating a pattern of negative behavior providing evidence of unsuitability. See 15 Cal. Code Regs. § 2402(b) (Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.); see also Biggs, 334 F.3d at 916 ("The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered.). This is precisely what the BPH determined. The BPH noted that Petitioner responded to these instances of negative behavior by blaming them on the other individuals involved. See Lodged Doc. Part 1, Attachment 3 at 89. The Board determined this was "further indication of a pattern of blaming [Petitioner's] criminal activity on external events, and is an indication to the Panel that [Petitioner] does not fully appreciate the wrongfulness of [her] conduct." Id. This conclusion is supported by the evidence.

In its 2004 denial, the Board determined that Petitioner had "not yet sufficiently participated in beneficial self-help programs." See Lodged Doc. Part 1, Attachment 8 at 97. The Board stated Petitioner needed "continued participation in self-help not only to further delve into the causative factors for her participation in this life crime, but to continue to develop the skills that will allow her to deal with stress in a non-destructive manner." Id. at 97-98. This finding is also supported by the evidence. Petitioner had a long history of tumultuous relationships and each one ended poorly for Petitioner. Her prior relationships led to great emotional problems ultimately leading to expressions of intended suicide or violence. It is telling that despite the fact

she was involved in therapy at the time of the instant offense, she still reacted violently by killing the victim. Although Petitioner has participated in many self-help programs while incarcerated, the Board's finding that Petitioner still remained unpredictable is not unsupported. The instances of her negative behavior in prison and her various attempts to place blame on others for her actions in light of her failed history of dealing with her emotions bear out the Board's concerns. Thus, there was some evidence to support the Board's 2004 conclusion that Petitioner needed further participation in self-help programs.

The Board also inquired into the circumstances supporting a finding of suitability for parole. See 15 Cal. Code Regs. § 2402(d). Petitioner did not have a criminal history, her age reduced the probability of recidivism, and her parole plans appeared viable. In addition, Petitioner had programmed exceptionally well institutionally. However, the Board concluded the factors demonstrating unsuitability outweighed these positive indicators.

The Ninth Circuit has held that serious questions involving a prisoner's liberty interest in parole would be raised if the Board continued to rely solely on the gravity of the offense and conduct prior to imprisonment to justify denial of parole, despite a prisoner's continuing demonstration of exemplary behavior and evidence of rehabilitation. Biggs, 334 F.3d at 916. Petitioner argues the Board continues to rely on the unchanging circumstances of the underlying offense. As discussed above, however, the circumstances of the offense, while significant, were not the only reasons for the Board's decision. Pursuant to 15 Cal. Code Regs. § 2402, the Board must consider "[a]ll relevant, reliable information available to the panel." In making its determination, the Board "shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release." Id. It is apparent the Board did so in this case and carefully balanced and assessed the various factors. Those findings were supported by at least "some

evidence."

Petitioner takes issue with the fact that the Board in its 2005 decision denied parole for a period of two years rather than the normal annual review. Cal. Penal Code § 3041.5(b)(2) states:

> The board shall hear each case annually thereafter, except the board may schedule the next hearing no later than the following:
>
> > (A) Two years after any hearing at which parole is denied if the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following year and states the bases for the finding.

In this case, the next parole hearing was deferred for two years. The Board stated the following reasons:

> All of my comments with respect to the nature of the offense are applicable to the multiple denial for two years. Specifically, I refer to the psych report previously read and the not direct response but the implied response submitted in your Exhibit today. As I indicated, I think that this is a hopeful sign but believe in light of the long incarceration history that you've had and the continued failure to appreciate and understand your roll [sic] in this offense that your letter, while hopeful, is going to take some time to determine whether or not it reveals itself by your continued actions. The terms of our recommendations, ostensibly, you are doing everything that you are supposed to do. What you've not done is demonstrate, as perhaps you have initially done here, your understanding, your ownership, if you will, of this offense in more than language. And we encourage you, not only to continue to remain disciplinary free, and to continue the programming and the work that you have done. You are in many ways a model inmate. But it is important that you demonstrate your insight into the commitment offense and your role in that, so that we can feel comfortable in recommending to the public, you and everybody else out there, that you are safe to be returned to society. You have the intellectual ability to do that. I think there is concern whether or not you have the emotional ability and until you demonstrate that you have that you are going to continue to be a risk.

See Lodged Doc. Part 1, Attachment 3 at 95-96.

Accordingly, the Board complied with the statute by stating its reason for the two-year deferral. In addition, as fully discussed above, the Board's decision was reasoned and supported by at least some evidence.

Petitioner also alleges she has been denied parole because of an arbitrarily established policy of indefinitely withholding the establishment of a parole date. This claim should also be rejected. As more fully discussed above, "[i]n the parole context, the requirements of due process are met if 'some evidence' supports the decision." Biggs, 334 F.3d at 914. If there is not some evidence to support a decision denying parole, due process is violated. Therefore, even though California law states that the BPT shall normally set parole release dates, due process

does not require the parole board to set a parole date where some evidence exists demonstrating that Petitioner should not be paroled. Here, there was some evidence supporting the Board's decision.

Petitioner further contends the Board's determination of unsuitability amounts to cruel and unusual punishment under the Eighth Amendment. This claim is also without merit. A criminal sentence that is not proportionate to the crime for which a defendant is convicted may violate the Eighth Amendment. However, no inference of gross disproportionality can be drawn in this case. Petitioner was convicted of first degree murder. Her sentence of 25 years to life is not grossly disproportionate to her crime. In addition, the parole board's action of repeatedly denying Petitioner parole does not violate the Eighth Amendment. See United States v. O'Driscoll, 761 F.2d 589, 599 (10th Cir.1985) ("A sentence of imprisonment for a very long term of years, the effect of which is to deny a prisoner eligibility for parole until a time beyond his life expectancy, does not violate the Eighth Amendment prohibition of imposition of cruel and unusual punishment.").

In light of the above, it cannot be said that the state court resolution of Petitioner's claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d).

**RECOMMENDATION**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.     The petition for writ of habeas corpus be DENIED; and

2.     Judgment be entered in favor of Respondent.

This Findings and Recommendations is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to

1  Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served
2  and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the
3  objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §
4  636 (b)(1)(C). The parties are advised that failure to file objections within the specified time
5  may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th
6  Cir. 1991).

7       IT IS SO ORDERED.

8       **Dated:**   **August 31, 2007**                **/s/ Dennis L. Beck**
                                                             UNITED STATES MAGISTRATE JUDGE